## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 12 2018, 6:20 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Lisa M. Johnson
Brownsburg, Indiana

ATTORNEYS FOR APPELLEE DCS

Curtis T. Hill, Jr.
Attorney General of Indiana

Kyle Hunter
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of K.K.M., Minor Child, and K.M., Mother, <br><br> *Appellant-Respondent*, <br><br> v. <br><br> Indiana Department of Child Services, <br><br> *Appellee-Petitioner* <br><br> and <br><br> Child Advocates, Inc., <br> *Co-Appellee.* | October 12, 2018 <br><br> Court of Appeals Case No. 18A-JT-760 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Gary Chavers, Judge Pro Tem <br><br> The Honorable Larry Bradley, Magistrate <br><br> Trial Court Cause No. 49D09-1705-JT-466 |

**Brown, Judge.**

[1] K.M. ("Mother") appeals the involuntary termination of her parental rights with respect to K.K.M. Mother raises two issues which we restate as whether the trial court erred in terminating her parental rights. We affirm.

## Facts and Procedural History

[2] On May 8, 2016, K.K.M. was born, and Mother and baby tested positive for cocaine. Mother, who was born on January 19, 1984, used cocaine "like once every few months" from the time she was twenty-two years-old until K.K.M.'s birth and, approximately a month before his birth, she "did it like maybe once a week for a month." Transcript Volume II at 8-9. On May 11, 2016, the Indiana Department of Child Services ("DCS") filed a petition alleging K.K.M. was a child in need of services ("CHINS") and stating that Mother had previously given birth to a drug-exposed infant, had a history with DCS and was previously offered services through a CHINS action, and "continues to demonstrate an inability to provide the child with a safe, drug-free home," despite prior services having been offered. Petitioner's Exhibit 19. On May 12, 2016, the court held an initial hearing and issued its Order Regarding Children in Need of Services Initial/Detention Hearing which indicates that Mother had no objections to DCS's recommendations because "she and grandmother have a good relationship" and that DCS noted K.K.M. remained in relative care with his maternal grandmother[1] and requested continued placement and for

---

[1] In her brief, Mother indicates that K.K.M. went home with his maternal grandmother when he left the hospital on May 10, 2016.

authorization for foster care. Petitioner's Exhibit 18A. The order, which indicates that the family case manager states "this is Mother's second substance-positive infant and they would like to see a length of time of negative screens before they recommend relative care supervision," authorized Mother to have supervised parenting time "contingent upon continued submission of clean screens." *Id.*

[3] On August 15, 2016, the court held a hearing on the CHINS petition, which Mother did not attend, continued K.K.M.'s placement and adjudicated him to be a CHINS, and found: Mother had three random drug screens and tested positive for cocaine, alcohol, and hydrocodone on May 10, 2016, and for alcohol on May 12, 2016, and May 25, 2016; Mother's attorney withdrew due to not having contact with her; and Mother had not had any parenting time with K.K.M. On the same day, the court issued both a dispositional order and a participation order. The latter required Mother to engage in home-based therapy and case management and follow all recommendations, to complete a substance abuse assessment and all treatment recommendations, and to submit to random drug and alcohol screens.

[4] On May 1, 2017, the court held a permanency plan hearing, which Mother did not attend, and found that she "has not participated in services and has been discharged a couple of times" and that the family case manager met last week with Mother who "acknowledged that she has not been engaged in services." Petitioner's Exhibit 1.

On May 22, 2017, DCS filed its verified petition for involuntary termination of Mother's parental rights. On October 23, 2017, the court held a hearing, in which Mother indicated that she continued using cocaine, marijuana, and alcohol after K.K.M.'s birth "every day" until September of 2017; that she spent "twenty bucks," or "not much at all," per week on drugs and alcohol; that she was living at her brother's home; that she was not currently working; that she had a ten year-old child and a five year-old child who were in their father's care; and that she was in a car wreck "maybe six months ago" in which she was driving her brother's car and was under the influence of alcohol, cocaine, and marijuana. Mother also stated that she had a criminal history related to her drug use that included possession of marijuana and operating while intoxicated that "was like six months ago", and that she did not successfully complete the services ordered by the court in the CHINS matter. Transcript Volume II at 11, 13-14. When counsel for the guardian ad litem asked if Mother's child, Ca., was born drug positive, Mother answered affirmatively and indicated she had been using cocaine, and the following exchange regarding Ca. and Mother's other child, Co., occurred:

> Q: And at the time that the CHINS was filed for [Ca.], in two thousand eleven, was your other child made a child in need of services at the same time?
>
> A: My oldest son?
>
> Q: Mhmm.
>
> A: No.

Q: If I have paper work showing an order to file on both children, would you disagree with that, or does that help refresh your memory?

A: I really don't understand – I don't – I don't understand, I am saying like I have the thing with [Ca.], so I don't think [Co.], I didn't have any problem with my oldest son.

Q: During that child in need of services case, did you complete any services to address your drug use?

A: No, actually, my kid's father took custody of my son.

Q: So that case closed eventually with the children going to their dad's?

A: Mhmm.

\* \* \* \* \*

Q: Okay. Would it have been April twenty ninth twenty thirteen when the case closed? You don't remember?

A: If it says it, I guess that is it.

\* \* \* \* \*

Q: Did you have an opportunity through that prior CHINS case to do drug treatment services?

A: Um, yes, I think so. I would think they would give thos [sic] – I kind of don't remember, but I would think they –

Q: You weren't able to complete them during that case?

A: I mean because with the – with my kids' father – just with the whole situation – he just adopted [Ca.], so – I don't think, I know – I don't remember.

*Id.* at 17-18.

[6] Mother agreed that all of the services ordered as part of the CHINS case for K.K.M. were appropriate and she needed them, that she missed "a lot of drug screens," and that some of them would have been positive if she had taken them. *Id.* at 20. When asked if she felt that she needed treatment before she could provide K.K.M. with a safe home, she stated, "I would think I need some – I need some structure in this – with this drug thing. I am clean, but I am battling it, I am struggling. I think maybe I can get some tools or something." *Id.* at 22-23. She indicated that she felt she needed treatment "with the tools and stuff," and stated "when I went to Valle Vista, I think I can wipe this out," that she needed "a little more time," and that "[s]ix days aint going to do it for me." *Id.* at 23.

[7] DCS family case manager Bradley Riddle testified that he assessed K.K.M. in May 2016, made the decision to remove K.K.M. from Mother based on the previous DCS history involving her two other children and the positive drug screens at the hospital, and that DCS ended up substantiating Mother for the neglect of K.K.M. The court heard testimony from case manager Sharon Sanders who began visitations with Mother in January 2017 and later conducted home-based case management in March of 2017 and who stated that Mother's visits "started to trail off due with [sic] [Mother] cancelling [and] there were times where she was late." *Id.* at 40. When asked when she noticed the change in Mother's attendance, case manager Sanders answered "about three months in . . . is when she started to give excuses why she could not come to

visits" and indicated that Mother missed about half of her visits with K.K.M. *Id.*

[8] Case manager Sanders also testified that Mother's initial goals included admission into rehab, employment, and housing. She answered in the negative when asked whether Mother felt like she could manage her addiction without treatment and indicated Mother received referrals to the Terra Treatment Center and Volunteers of America, needed to go to the detox center before she could be admitted to Terra, and attended Valle Vista for detox during the first week of September 2017.[2] She indicated Mother was fired from Caito Food Service because she did not complete her application correctly, and testified "[b]etween mom and her brother" when asked where Mother was living at the time of her client assessment and "[s]ame, between mom and brother" when asked where Mother was living now. *Id.* at 43. When asked to identify Mother's greatest barriers to achieving her goals, case manager Sanders answered "communication with me" and "waiting to be admitted to a bed," and indicated later that Mother did not communicate with her when she was under the influence and that communication was a problem "because we were unable to complete any goals or objectives." *Id.* at 45, 52.

---

[2] Respondent's Exhibit VV indicates that Mother was admitted on August 29, 2017, to Valle Vista Health System, and was discharged on September 6, 2017. On the "Reason for Hospitalization" line, the "detox" box is marked. Respondent's Exhibit VV at 3.

Case manager Sanders testified that she had seen Mother intoxicated at an August 8, 2017 court hearing,[3] and that Mother had told her she had been drinking. After indicating that Mother attended Fairbanks "for about seven days, six days" before attending Valle Vista, she agreed with counsel for DCS that Mother used after that period of time and indicated that it was because Mother "verbally has stated that she has used." *Id.* at 77. She testified that she did not believe that Mother was currently able to care for a child because "she has not had the treatment that she needs." *Id.* at 47. She also indicated that the house of Mother's mother was inappropriate for a child "due to the traffic in the home." *Id.* at 69.

Guardian ad litem Jennifer Ankney ("GAL Ankney") testified that Mother attended one child and family team meeting and was not in attendance at the other ones, that she did not recommend placement of K.K.M. back with Mother because she did not believe Mother had "demonstrated her ability to address her sobriety or maintain her sobriety," and that she recommended continuing with the plan of adoption with foster parents, who "have provided . . . a very safe, loving home" for K.K.M. for nearly a year and with whom he had bonded. *Id.* at 84. She indicated it was in K.K.M.'s best interests that Mother's rights be terminated because she did not believe Mother had addressed her ability to provide a safe and stable home for him and

---

[3] The record contains a copy of the chronological case summary for the CHINS case involving K.K.M. and Mother which indicates that a placement review hearing was completed on August 7, 2017.

characterized Mother's participation in the CHINS case as "[n]on-existent, really." *Id.* at 85.

[11]    On January 10, 2018, the court continued the hearing and Mother's mother testified that she never left K.K.M. alone with Mother "[f]or his protection." *Id.* at 218. Nia Williams, K.K.M.'s family case manager since September 2016 ("FCM Williams"), testified that when she was assigned to the case, Mother was not engaging in services and that her whereabouts were unknown, that she talked with Mother about engaging in services in November 2016, and that she made a new referral for drug screens as well as referrals for home-based care management with supervised visitation, a substance abuse assessment, and home-based therapy. She indicated that Mother had not completed any court-ordered services and that the next time she spoke with Mother was mid-to-late April 2017, when she made Mother aware of the May 1, 2017 permanency hearing. FCM Williams stated she had met with Mother prior to an August 7, 2017 hearing and that Mother was "under the influence that day" and behaving very erratic, kissed her, and "tripped over like nothing that was there." *Id.* at 104-105. She testified that K.K.M. has not been returned to Mother's care since he was removed and Mother had not remedied the conditions for DCS's initial involvement and for K.K.M.'s continued placement, and that Mother "was completing treatment, and then she relapsed. She chose not to engage when referrals were made for her previously." *Id.* at 107.

[12]    FCM Williams agreed when asked if continuation of the parent-child relationship between Mother and K.K.M. would pose a threat to his well-being

and explained that Mother's "situation right now isn't stable. Again, she doesn't have a stable home." *Id.* at 108. She agreed that termination of the parent-child relationship was in K.K.M.'s best interests because "she is not able right now to meet [K.K.M.'s] needs. She is not able to parent appropriately until she regains and maintains her sobriety." *Id.* at 109. During cross-examination, counsel for the guardian ad litem asked FCM Williams if the drug treatment that Mother was currently engaged in was the only drug treatment she had received during K.K.M.'s life, and FCM Williams answered negatively and stated that Mother had "went through Fairbanks prior to this" and "completed a substance abuse assessment, I believe through Families First before this." *Id.* at 111.

[13] The court heard additional testimony from Mother in which she testified that her current residence was at Volunteers of America ("VOA"), a recovery treatment center, that she had been there since October 2017 and finished the acute program at one point, that when she "was on the second phase, a screen came back positive for marijuana" and she had to "drop back down," and that she was still on the twenty-one day acute phase.[4] *Id.* at 226. When asked if she thought she could return to her employment at Taco Bell that she had started on her second phase, she stated "I can. I still have employment there." *Id.* at

---

[4] The VOA Fresh Start Recovery Center Monthly Report from December 2017 indicates that Mother was "due to complete the Step-Down Phase of and discharge from the Fresh Start Recovery Center" on January 17, 2018 and that Mother restarted the Acute Phase on December 29, 2017, when she tested positive for THC. Respondent's Exhibit TT.

227. She answered negatively when asked by her counsel if she used drugs before December 17, 2017, and stated "[n]o ma'am I didn't" when asked "[y]ou had a positive screen on December seventeenth, did you use?" *Id.* at 229. She indicated that she did not have any explanation for the positive screen. (***Id.***) She testified that she had not seen K.K.M. since April 2017 and, in explaining what happened when she stopped visiting, stated:

> [DCS] stopped my visits because I wasn't – I honestly wasn't – would have visits. Sometimes I would cancel visits. I was still using and um when I would have my visits some days, I would call and let them know because I had become under the influence, so I would have my visits – I wasn't consistent honestly with my visits.

*Id.* at 232. She answered negatively when asked if she believed she still had visits and stated "[t]hey told me I couldn't receive my visits until I got into treatment." *Id.* at 232-233.

[14] On March 13, 2018, the court entered an order terminating Mother's parental rights, which provided in part:

> 10. [Mother] was to undergo a substance abuse assessment and follow recommendations due to [Mother] having a long history of cocaine, marijuana and alcohol abuse. She was involved in a CHINS case approximately six years ago when another child was born cocaine positive. That case ended with her child being placed with the father due to [Mother] being unsuccessful at services.

> 11. [Mother] has had periods of sobriety but has not maintained it for the past eleven years.

12. After a lapse in time, [Mother] did go to Fairbanks Hospital to address substance abuse. She later relapsed.

13. [Mother] went through a seven-day program with Fairbanks but relapsed thereafter.

14. In September of 2017, [Mother] went through a detoxification program through Valle Vista.

15. As of the first day of trial in this matter, [Mother] was awaiting a bed in a drug program through Tara. [Mother] felt she needs treatment and struggles with her sobriety.

16. [Mother] did not go to Tara, but in late October of 2017, commenced a program through [VOA].

\* \* \* \* \*

20. As of the time of trial in this matter, [Mother] had not successfully completed any of the Court ordered services.

Appellant's Appendix Volume II at 16-18. The order concluded that there was a reasonable probability that the conditions that resulted in K.K.M.'s removal and continued placement outside the home would not be remedied by Mother "who has failed to successfully complete a service, maintain[] employment and housing, and has not demonstrated she is able to maintain sobriety," and that termination of the parent-child relationship was in K.K.M.'s best interests. *Id.* at 18.

### *Discussion*

The issue is whether the trial court erred in terminating Mother's parental rights. In order to terminate a parent-child relationship, DCS is required to allege and prove, among other things:

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).  If the court finds that the allegations in a petition described in Ind. Code § 31-35-2-4 are true, the court shall terminate the parent-child relationship.  *See* Ind. Code § 31-35-2-8(a).

[16]  The State's burden of proof for establishing the allegations in termination cases "is one of 'clear and convincing evidence.'"  *In re G.Y.*, 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2), *reh'g denied*.  This is "a 'heightened burden of proof' reflecting termination's 'serious social consequences.'"  *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014) (quoting *In re G.Y.*, 904 N.E.2d at 1260-1261, 1260 n.1).  "But weighing the evidence under that heightened standard is the trial court's prerogative—in contrast to our well-settled, highly deferential standard of review."  *Id*.  We do not reweigh the evidence or determine the credibility of witnesses, but consider only the

evidence that supports the judgment and the reasonable inferences to be drawn from the evidence. *Id*. We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment. *Id*.

[17] Reviewing whether the evidence clearly and convincingly supports the findings, or the findings clearly and convincingly support the judgment, is not a license to reweigh the evidence. *Id*. "[W]e do not independently determine whether that heightened standard is met, as we would under the 'constitutional harmless error standard,' which require*s the reviewing court itself* to 'be sufficiently confident to declare the error harmless beyond a reasonable doubt.'" *Id*. (quoting *Harden v. State*, 576 N.E.2d 590, 593 (Ind. 1991) (citing *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824 (1967))). "Our review must 'give "due regard" to the trial court's opportunity to judge the credibility of the witnesses firsthand,' and 'not set aside [its] findings or judgment unless clearly erroneous.'" *Id*. (quoting *K.T.K. v. Ind. Dep't of Child Servs., Dearborn Cty. Office*, 989 N.E.2d 1225, 1229 (Ind. 2013) (citing Ind. Trial Rule 52(A))). "Because a case that seems close on a 'dry record' may have been much more clear-cut in person, we must be careful not to substitute our judgment for the trial court when reviewing the sufficiency of the evidence." *Id*. at 640.

[18] We note that the involuntary termination statute is written in the disjunctive and requires proof of only one of the circumstances listed in Ind. Code § 31-35-2-4(b)(2)(B). Because we find it to be dispositive under the facts of this case, we limit our review to whether DCS established that there was a reasonable

probability that the conditions resulting in the removal or reasons for placement of K.K.M. outside the home will not be remedied. *See* Ind. Code § 31-35-2-4(b)(2)(B)(i).

[19] In determining whether the conditions that resulted in K.K.M.'s removal will not be remedied, we engage in a two-step analysis. *See In re E.M.*, 4 N.E.3d at 642-643. First, we identify the conditions that led to removal, and second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* at 643. In the second step, the trial court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions, balancing a parent's recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. *Id.* Requiring trial courts to give due regard to changed conditions does not preclude them from finding that a parent's past behavior is the best predictor of future behavior. *Id.*

[20] "The statute does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside the home." *In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013) (citation and internal quotation marks omitted). A court may consider evidence of a parent's prior criminal history, history of neglect, failure to provide support, lack of adequate housing

and employment, and the services offered by DCS and the parent's response to those services, and, where there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances the problematic situation will not improve. *Id.* A trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that his or her physical, mental, and social growth are permanently impaired before terminating the parent-child relationship. *In re Z.C.*, 13 N.E.3d 464, 469 (Ind. Ct. App. 2014), *trans. denied*.

[21] Mother challenges several of the court's findings, contends that K.K.M. was "removed from Mother solely because he and Mother tested positive for cocaine" at the time of his birth, and argues that there is no clear and convincing evidence that this condition will not be remedied. Appellant's Brief at 12. She asserts, in part, that the court's findings that Mother failed to complete any services and failed to demonstrate an ability to maintain sobriety are not supported by the evidence given she successfully completed a substance abuse assessment and a detoxification program, submitted to many random drug screens, is actively engaged in and receiving intensive therapy at a residential treatment program at VOA, and is fully engaged in home-based case management. Mother admits that the court's finding that she has not had parenting time with K.K.M. since April 2017 is factually accurate, but argues that it does not support the conclusion that the removal conditions are unlikely to be remedied.

[22] DCS contends Mother's refusal to engage in court-ordered services and failure to provide a drug-free home contributed to the continued removal of K.K.M. and argues that the trial court's conclusion that Mother will not remedy the conditions is not clearly erroneous and is supported by the facts that she did not participate in substance abuse services until after the petition for termination had been filed, failed to complete court-ordered services, and did not have any visitation with K.K.M for approximately six months by the first day of the termination hearing. DCS argues that "[u]ltimately, it was Mother['s] long history of drug use, her consistent refusal to participate in services over multiple years and multiple CHINS cases, and her history of relapses that lead [sic] the trial court to determine that there was a reasonable probability that Mother would not remedy the reasons that Child was removed from her care." Appellee's Brief at 25.

[23] The record reveals that Mother had used cocaine, prior to K.K.M.'s birth, since she was twenty-two years-old and, approximately a month prior to his birth on May 8, 2016, Mother used it "like maybe once a week for a month." Transcript Volume II at 8-9. K.K.M. was Mother's second child who was born drug positive while she was using cocaine. After K.K.M.'s birth, Mother had three random drug screens in which she tested positive for cocaine, alcohol, and hydrocodone on May 10, 2016, and for alcohol on May 12, 2016, and May 25, 2016; and she admitted, at the October 23, 2017 hearing that she continued using cocaine, marijuana, and alcohol after K.K.M.'s birth "every day" until September of 2017, spent "twenty bucks" per week on drugs and alcohol, and

was in a car wreck "maybe six months" prior in which she was driving her brother's car and was under the influence of alcohol, cocaine, and marijuana. *Id.* at 11, 13. Mother also agreed at the hearing that she had an opportunity through her prior CHINS case to complete drug treatment services, that all of the services ordered as part of K.K.M.'s CHINS case were appropriate, and that she missed "a lot of drug screens," some of which would have been positive if she had taken them. *Id.* at 17-18, 20. While we observe Mother's completion of the acute program at VOA at one point, we note that the trial court is given discretion in balancing her very recent efforts at improvement against the habitual patterns of her conduct, in determining that the evidence of Mother's prior history is the best predictor of her future behavior, and in finding that Mother "has had periods of sobriety but has not maintained it for the past eleven years." Appellant's Appendix Volume II at 16. Considering Mother's unresolved substance abuse issues, together with the trial court's other findings, we conclude that clear and convincing evidence supports the court's determination that there is a reasonable probability that the conditions leading to K.K.M.'s removal will not be remedied. *See In re A.S.*, 17 N.E.3d 994, 1005 (Ind. Ct. App. 2014) (holding that there was a reasonable probability that the conditions that led to the children's removal, including substance abuse, would not be remedied and noting that "while [the mother] remedied two of the conditions that led to the children's removal, there was no evidence that she would remedy her substance abuse," and "[e]ven though [father] attended a month of treatment at Aspire, he failed to attend the last eight weeks of his program, which caused Aspire to discharge him for non-attendance").

While Mother does not argue that termination of her parental rights was not in K.K.M.'s best interests, we observe that case manager Sanders answered in the negative when asked whether Mother felt like she could manage her addiction without treatment and that Mother indicated she needed more treatment and "a little more time." *Id.* at 23. We also observe that GAL Ankney testified in support of the request for termination and indicated it was in K.K.M.'s best interests because she did not believe Mother had addressed her ability to provide a safe and stable home for him; and that FCM Williams agreed that termination was in K.K.M.'s best interests because Mother "is not able right now to meet [K.K.M.'s] needs. She is not able to parent appropriately until she regains and maintains her sobriety." Transcript Volume II at 109. Our review of the evidence as set forth above and in the record reveals that the evidence supports the trial court's best interests determination.

## Conclusion

We conclude that the trial court did not err in terminating Mother's parental rights.

Affirmed.

Altice, J., and Tavitas, J., concur.